LEIGH M. CLARK, Retired Circuit Judge.
This is an appeal from a conviction of murder in the first degree. It was alleged in the indictment that defendaht “unlawfully, and with malice aforethought, killed Jimmy Tucker, by shooting him with a shotgun.”
The undisputed evidence shows that the alleged victim was wounded about 10:00 or 11:00 P.M. June 13, 1978, by one or two blasts from a .410 gauge shotgun that resulted in his death the following day.
Defendant pleaded not guilty and not guilty by reason of insanity. Appellant urges that on the issue raised by each plea the evidence was not sufficient to support the verdict and the court’s action in overruling defendant’s motion for a new trial. We discuss each contention under a separate caption.
PLEA OF NOT GUILTY
Jerome Tucker, the son of the alleged victim, testified that he had had a fight with the defendant prior to the time his father was shot, that later that evening while he was at home, he saw an automobile with defendant in it go by and that defendant shouted out of the window of the automobile “that we got the ‘MF.’ ” He said he then went to look for his father and found him on the ground with gunshot *356 wounds in the area of his abdomen; he and his brother then took the victim to the hospital. He said that on the way to the hospital his father told him that defendant and her son, Max Hall, Jr., shot him.
Patricia Hall, the thirteen-year-old daughter of defendant, testified that defendant told her son, Max Hall, Jr., that Jerome Tucker had beaten her; her mother got a pistol and Max got a shotgun; the three of them, with two other persons, went in an automobile to where Jimmy Tucker was at the time. Defendant and Max got out of the automobile and soon thereafter she heard Jimmy Tucker’s voice and some shots from a shotgun or shotguns. The witness ran from the scene. Upon her return her mother told her that they had killed “Mr. Jimmy.”
The sister of defendant testified that having heard of the fight between defendant and Jerome Tucker, she and Jimmy Tucker went down to Lacie Evans’ .house to use his telephone and call the Sheriff’s Department; she went inside the house and Jimmy Tucker stayed on the outside with a shotgun. She heard a shot on the outside arid heard the voice of Jimmy Tucker and the voice of her sister, defendant. She heard Jimmy Tucker say, “Leola, you done shot me once so don’t shoot me no more.” She heard her sister say, “I done killed that Mother _,” and that there were two more she was going to kill. She said defendant then broke into the house.
Other witnesses testified as to the events that culminated in the death of Jimmy Tucker, but there is no substantial evidence that points to any reasonable conclusion other than that defendant, though perhaps provoked, took an active part with her young son, while each was armed, in aggressively planning and causing the death of Jimmy Tucker. The testimony is inconclusive as to whether defendant or Max Hall fired the .410 shotgun that killed Tucker, but there is no escape from the conclusion that one of them did so; that if Max Hall did so, defendant was aiding and abetting him at the time.
PLEA OF NOT GUILTY BY REASON OF INSANITY
Almost all of appellant’s assertions of reversible error revolve around this issue.
■ The evidence from witnesses called by the State, as well as witnesses called by defendant, is profuse with testimony as to defendant’s irrational behavior during the day and night of the homicide and at times for a long period before. According to the evidence, defendant had been a patient at Bryce Hospital in 1969 for an “acute schizophrenic episode.” She was later treated at the Montgomery Mental Health Clinic, provided medication on a monthly basis to control her psychotic symptoms and continued on such medication until April 1978, two months before the homicide.
Defendant was again admitted to Bryce Hospital two days after the homicide, where she remained until August 16, 1978, when her condition had stabilized because of medication.
All of the lay witnesses who testified as to defendant’s mental condition were relatives of defendant. They included a daughter and sister who testified on call of the State and whose testimony we have discussed under the caption of “PLEA OF NOT GUILTY.” Testifying on call of the defendant were Lucille Pritchett, defendant’s aunt; Pauline Sankey, defendant’s daughter; Mossie Thomas, defendant’s sister, and Samuel Thomas, the husband of Mossie Thomas. By mentioning the relationship between said witnesses and defendant, no implication is intended in derogation of the trustworthiness of their testimony. As a whole, all of their testimony as to the mental condition of defendant is impressive as a sincere effort to adhere strictly to the truth in their unenviable status as witnesses, torn between a natural affection for defendant and their consciousness of the consequences of her conduct. In general, their testimony is remarkable for the abundance of their recognition of defendant’s “strange,” “crazy,” and abnormal behavior at times and the scarcity of definite opinions that she was insane at the time of the *357 crime or that she was incapable of discernment between right and wrong. Most of them referred particularly to the occasion of a funeral for defendant’s grandmother that occurred the Sunday before Jimmy Tucker was killed. One was impressed by defendant’s conduct while the two were looking around the cemetery before the funeral, when defendant seemed “upset” and stated that on a gravestone of one of their relatives the date was wrong. Another observed that on the day of the funeral of defendant’s grandmother, defendant made the statement that some of the people at the funeral were talking about defendant. It seems that she was not in complete control of her emotions on that occasion.
Reference was made, by most of the relatives who testified, to occasions when defendant would undress in their presence. The record is not clear as to whether this was done in an area of relative privacy or otherwise.
There was also testimony by relatives of defendant that at times she claimed that she was God. Her claim in this respect seems to have been stressed soon after the death of Jimmy Tucker.
Although Samuel Thomas, defendant’s brother-in-law, had not known defendant as long as her relatives by consanguinity, it appears from his testimony that the only time she had ever caused him to consider her conduct “strange” was on the occasion of her grandmother’s funeral. Excerpts from his testimony are as follows:
“A. Yes. It was a time at her grandmother’s funeral, we was going to the cemetery and she walked over toward me and said, ‘Samuel, people was riding with us.’ And she said, they were talking about her. I said, ‘No, they aren’t talking about you, they don’t even know you.’ And she said, ‘Yes, they are. They are talking about me.’ And I said, ‘No, they aren’t talking about you.’ And we left it like that.
“Q. Anything else that indicated to you or was a strange incident or occurrence that you can remember?
“A. No, that was all.
“Q. And this was the Sunday before the shooting of Jimmy Tucker on that Tuesday.
“A. That’s right.
“Q. And in the seven or eight years that you have been knowing her, did you have occasion to spend time with her?
“A. No.
“Q. But on this particular occasion of the funeral, that was strange to you? “A. Right, yes.

“Q. Mr. Thomas, being upset at the funeral, you are not equating that to be crazy, are you?
“A. No, I wouldn’t call it that.”
The only lay witness unrelated to defendant who testified as to her mental condition was Jerome Tucker, son of the victim. On redirect examination he seemed to sum up his opinion as to her mental condition as follows:
“Q. Jerome, I believe you answered defense counsel’s question when he asked you about Leola’s sanity from the time she left the hospital until the time of this incident. And he asked you whether or not she was crazy. Was your answer that she was not crazy?
“A. I don’t know, sir.
“Q. Well, did she give you the impression that she was crazy?
“A. The way she was acting — the way she acted about do you want to fight or anything, she acted like she was crazy.
“Q. Okay. What I’m saying is, between the time that she — was it more like she was crazy or she was mad?
“A. Both to me.
“Q. Okay. The time between when she went off the crazy house—
“A. Yes, sir.
“Q. —Would this have been the first time that she acted crazy or anything like that?
“A. The first, you know, I have seen her.
“Q. I believe you stated you saw her almost every day.
“A. Yes, sir.”
*358 Defendant testified in her own behalf. Her testimony as to what occurred between her and Jerome Tucker is reasonably clear. Her testimony as to what occurred at the time of the killing of Jimmy Tucker is not clear. A part of it is as follows:
“Q. But you do remember seeing Jimmy Tucker?
“A. Yes, sir.
“Q. Did you shoot Jimmy Tucker?
“A. No, sir.
“Q. With a shotgun?
“A. No, sir.
“Q. Did you shoot Jimmy Tucker with a pistol?
“A. No, sir.
“Q. Well,, what happened to Jimmy Tucker after you first saw him?
“A. Jerome went and got them. Jimmy Tucker was going to shoot me and my son with this shotgun right here.
“Q. Is that Jimmy Tucker’s shotgun?
“A. Yes, this is his gun right here.
“Q. Okay. Did you tell Max to shoot Jimmy Tucker?
“A. No, sir. I didn’t tell Max nothing like that.
“Q. Did you and Max plan to shoot Jimmy Tucker?
“A. No, sir.
“Q. Did you plan to shoot anyone?
“A. No, sir.
“Q. Do you remember going — do you remember seeing Jimmy Tucker shot?
“A. Yes, sir. I see him shot at us. They shot at us first.
“Q. Did you see Jimmy Tucker get shot?
“A. No, sir, I ain’t seen him get shot.
“Q. Did you see him at all after he ran?
“A. Jerome ran. Jimmy Tucker stayed with his shotgun.
“Q. Did Jimmy Tucker run?
“A. No, sir.
“Q. But you didn’t see him any more after he shot in the air?
“A. Yes.”
On recross-examination, defendant said:
“Q. Are you crazy now?
“A. Who?
“Q. You.
“A. No, sir, not now.
“Q. Not now?
“A. Not now.”
No physician testified in the case. No witness with any special education, training or experience in the field of mental disorders, other than Carolyn Pike, who only saw defendant on “one occasion” prior to her testimony, who worked with the Montgomery Area Mental Health Center and spoke largely from the record of such Center, commencing in 1969 and continuing with interruptions until September 1978. She prefaced some of her answers to questions by stating, “I have no medical qualifications.” The salient part of her testimony on direct examination by defendant is as follows:
“Initially, I believe — now, I’ll have to check the record to be sure, but I believe she was taking mellaril, which is an anti-psychotic medicine, which is a tranquilizer. We soon switched her to another anti-psychotic medication, compazine, on which she was maintained from 1971 until April 1978, when we recommended she discontinue the medication.”
The witness referred to side effects from some of the medication. She also referred to Dr. Averrett, a physician, who saw defendant in October 1978, about three months before her trial. As a part of defendant’s Exhibit 1, admitted in evidence, an entry by Dr. Margaret Averrett, physician consultant, is as follows:
“Sankey, Leola # 3281
“10-24-78 PHYSICIAN’S NOTE:
“The patient is a 36-year-old black female with the diagnosis of Schizophrenia, Chronic, Undifferentiated Type, recently discharged from Bryce Hospital. On discharge, she was taking Thorazine, 200 mgs. t.i.d., Lithium Carbonate, 300 mgs. t.i.d., and Akineton, 2 mgs. b.i.d. On 9-19-78, she was seen by Ms. Smith and medication was changed to Thorazine, 400 mgs. h.s., and Cogentin, 2 mgs. h.s. Today, she is neatly dressed, pleasant and cooperative. She has no complaints, says she is doing alright, sleeps well and is *359 happy at home. She shows no sign of extrapyramidal symptoms. She is being followed in HSI Clinic for hypertension and takes some medication for that. Prescription given for Thorazine, 200 mgs. 2 h.s., # 70, 1 refill, Cogentin, 2 mgs., 1 h.s., # 35, 1 refill, to return in two months.”
Appellant argues that the evidence overcame as a matter of law the presumption of sanity to be found in the Code of Alabama since 1896.
“Every person over 14 years of age charged with crime is presumed to be responsible for his acts, and the burden of proving that he is irresponsible is cast upon' the accused. The defense of insanity in all criminal prosecutions shall be clearly proved to the reasonable satisfaction of the jury.” Code 1975, § 15-16-2.
Appellant places reliance largely upon the authority of Christian v. State, Ala., 351 So.2d 623 (1977). The action of the Supreme Court in reversing the conviction of Christian on the ground “that the overwhelming evidence presented by appellant has amply overcome the presumption of sanity as to this accused” and that the verdict in the case was “contrary to the preponderance of the evidence and that this cause must be reversed” has been followed by a reversal for the same reason in Woods v. State, Ala.Cr.App., 364 So.2d 1178, cert. denied Ala., 364 So.2d 1186 (1978) and Herbert v. State, Ala.Cr.App., 357 So.2d 683, cert. denied Ala., 357 So.2d 690 (1978). We are informed by Judge Bowen in Meredith v. State, Ala.Cr.App., 370 So.2d 1075, 1076, cert. denied, Ala., 370 So.2d 1079, as to Christian, Woods and Herbert, with “the addition of Pickett v. State, 37 Ala.App. 410, 71 So.2d 102, cert. denied, 260 Ala. 699, 71 So.2d 107 (1954),” that:
“. . . [Tjhese four cases represent the only occasions where judgments of conviction have been reversed by an appellate court of Alabama because the jury verdicts were contrary to the preponderance of the evidence on the issue of insanity.”
As was found in Meridith, supra, we find that the evidence on the question of insanity “falls far short of that presented in Christian, Woods, Herbert, and Pickett.”
As opposed to the absence of any testimony of experts in the instant case, in Pickett, supra, there was strong, unchallenged testimony of one or more medical experts. A physician who practiced in the town where defendant lived, who had previously treated him, whose practice included treatment of patients of unsound mind, said that in his opinion “The appellant was congenitally feeble minded and was of a mental age of four or five years.” There was evidence that defendant could never get beyond a “D” in his ABC’s. A trustee of the school attended by Pickett testified that he never “made a grade” during his schooling.
In Christian, supra, each of three psychiatrists testified that “Christian was insane at the time he committed the homicide.” In Woods, supra, defendant was examined by competent psychologists and a psychiatrist at Bryce Hospital. Both concluded that he was “legally insane at the time he committed the offense and that he did not know right from wrong.” In Herbert, supra, a professor in psychology at the University of Alabama testified that the appellant was insane at the time of the crime. The then chairman of the Forensic Evaluation Board at Bryce Hospital, testified that, in his opinion, “the appellant did not know right from wrong” with regard to “the homicide with which he was charged.”
In the four cases cited, the testimony of recognized experts of insanity at the time of the alleged crime was definite, clear, positive and uncontradicted. There is no such testimony in this case. In the case now before us, the non-expert testimony unquestionably portrayed defendant as a person with serious mental problems. However, it missed the mark of convincing proof that defendant was insane at the time she committed the crime.
That issue was properly submitted to the jury, and the trial court was not in error in overruling defendant’s motion for a new trial.
*360 Appellant’s only asserted issue unresolved hereinabove is focused upon the following part of the State's cross-examination of Ms. Carolyn Pike, the mentioned employee of the Montgomery Area Mental Health Center:
“Q. Are you’all concerned at the present time about whether or not she would retrogress and commit other schizophrenic episodes — go into other schizophrenic episodes?
“A. Yes, sir.
“Q. You are concerned about this?
“A. Yes. That is why we have her on medication at this time.
“Q. And if she happened to kill people when she is one of the schizophrenic episodes, do you just keep her on medication?
“MR. HUTCHINSON: Judge, I am going to object to the speculative-type question. We haven’t laid a predicate that she is an expert.
“THE COURT: Well, if she can’t answer, she won’t have to.
“Q. These schizophrenic episodes, do they go and come?
“A. May I say that I am being asked, it seems to me, to testify as an expert witness.
“Q. Well, you are an expert witness.
“THE COURT: Don’t argue. If you can’t answer, just tell him you can’t answer. Let’s move along.
“The Witness: I can answer it, but it would be speculative. In my experience, yes. Psychotic episodes do come and go.
“Q. Okay. And notwithstanding that fact, you just still keep them on medication and’let them run out in public.
“THE COURT: You are arguing.
“MR. GILLIS: No other questions at this time.
“THE COURT: Anything further from this witness?
“MR HUTCHISON: That’s all, Your Honor.
“(At this time, the witness was excused and released.)”
Appellant likens the quoted cross-examination to the argument of counsel for the State which the Supreme Court held to be so improper and prejudicial as to require a reversal of the judgment of the trial court in Christian v. State, supra. In some respects, implications of the quoted questions in the instant case are similar to the argument considered in Christian, supra, as well as in the most recent reported case on the subject. White v. State, Ala.Cr.App., 376 So.2d 1129, cert. denied, Ala., 376 So.2d 1132 (1979). They border upon efforts to influence the jury into believing that when a verdict of not guilty by reason of insanity is returned, the defendant will immediately or eventually be released from confinement as a likely prospect for a repetition of criminal conduct. Such argument, such efforts have been uniformly condemned. Allred v. State, 291 Ala. 34, 277 So.2d 339. They are highly improper. Christian v. State, supra; Allred v. State, 291 Ala. 34, 277 So.2d 339 (1973); Dunn v. State, 277 Ala. 39, 166 So.2d 878 (1964); Boyle v. State, 229 Ala. 212, 164 So. 575 (1934); Anderson v. State, 209 Ala. 36, 95 So. 171 (1922).
We do not approve the quoted questions asked by counsel for the State. Nevertheless, we do not find that they transgress the established rule. They fall short of the highly prejudicial argument made in Christian, supra, and cases relied upon therein, which argument rose in crescendo to the final statement of State’s counsel on the subject as follows:
“If you return a verdict of not guilty by reason of insanity against this man, this means this man is scott free — free to walk the streets of Tuscaloosa again.”
Such statement is unmatched by anything contained in the quoted questions in the instant case.
Moreover, we should note that in Christian the Supreme Court held that the issue as to the prejudicial remarks of the prosecution was raised by defendant on his motion for a new trial, which “preserved the issue” for review. There was a motion for a new trial in the instant case, but it contained no ground referable to the point now under *361 consideration. It is to be noted in the portion of the record quoted above the defendant did not make a similar complaint to the one now made by appellant.
We find no error in the record prejudicial to defendant. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court. The judgment below is hereby
AFFIRMED.
All the Judges concur.